1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

7

**DISTRICT OF NEVADA**

8
9    SHAWN SHELTON,

10          Petitioner,                                    2:12-cv-01633-JCM-VCF

11    vs.
                                                            **ORDER**
12    HOWARD SKOLNIK, *et al.*,

13          Respondents.

14    _____/

15

16    Introduction

17          This habeas corpus action is brought by Shawn Shelton, a Nevada prisoner serving four terms

18    of life in prison, with the possibility of parole, on convictions, entered July 9, 2007, in Nevada's

19    Eighth Judicial District, for first degree kidnapping, sexual assault upon a minor under the age of

20    sixteen, battery with intent to commit sexual assault, and use of a minor in the production of

21    pornography.  The court denies Shelton habeas corpus relief.  The court also denies Shelton a

22    certificate of appealability.

23    Procedural History and Factual Background

24          The evidence at Shelton's jury trial showed that on May 21, 2006, Shelton approached

25    fourteen-year-old OC at a Las Vegas bus stop, showed him a badge and told him he was a police

26    officer investigating a crime, coaxed him into his vehicle, drove him to different locations,

handcuffed him, battered him when he resisted, sexually assaulted him, and took a photograph of him during the sexual assault.[1]

At trial, OC testified for the prosecution.  *See* Trial Transcript, April 11, 2007, Exhibit 55B, p. 57 - Exhibit 55C, p. 116.[2]  OC testified that on May 21, 2006, at about 6:00 or 6:30 p.m., he took a bus from his home to Boulevard Mall in Las Vegas to buy grip tape for his skateboard at a Copeland's Sports store located near the mall.  Exhibit 55B, pp. 58-60; 94.  At about 8:00 p.m., he was on his way home by bus, and waiting at a bus stop.  *Id*. at 58-60; 95-96.  OC testified that Shelton pulled up near the bus stop in a black Hummer H2, and told OC that he was a police officer, and that he was looking for a boy named Joshua who was suspected of committing rape and murder. *Id*. at 59-60, and Exhibit 55C, pp. 102-03; *see also* Exhibit 55B, pp. 88-89 (OC's identification of Shelton at trial).  Shelton told OC that he looked like the suspect he was looking for.  Exhibit 55B, pp. 59-60.  Shelton showed OC a badge.  *Id*. at 60-61.  Shelton told OC to get in the Hummer and close the passenger door, and OC did so.  *Id* 60-62.  Shelton told OC he needed to get some information from OC -- his address, his school, his birthday, his birthplace -- and OC gave him that information.  *Id*. at 61.  OC had with him his cell phone, a skateboard, the grip tape he had just bought, and an MP3 player.  *Id*.  Shelton asked OC to show him identification, and OC told him he did not have any.  *Id*.  Shelton then told OC that he was going to take him to a police trailer at a different location, to get more information from him.  *Id*. at 61-62; Exhibit 55C, pp. 105-06.

Shelton then drove OC to a different location.  Exhibit 55B, p. 62; Exhibit 55C, p. 103. Shelton told OC he was going to take his fingerprints, but he did not do so.  Exhibit 55B, p. 62. Rather, Shelton put handcuffs on OC, handcuffing his hands behind his back.  *Id*.; Exhibit 55C, pp. 103-05, 116.

---

[1]  In this order, the court refers to the juvenile victim as OC, as did the Nevada Supreme Court in its order on Shelton's direct appeal.  *See* Order of Affirmance, Exhibit 82.

[2]  The exhibits referred to in this order by number only (*e.g.* "Exhibit 1") are those filed by respondents and located in the record at ECF Nos. 9-15.

Shelton then drove OC to another location, this one in a "desert area," which was evidently a vacant lot near a drugstore not far from OC's home.  Exhibit 55B, p. 62; Exhibit 55C, p. 105-06; *see also* Exhibit 55C, pp. 134-35 (testimony of Marnie Carter).  OC described the interior of the Hummer, and various items in the Hummer, in detail.  Exhibit 55B, pp. 63-65.  OC noticed that Shelton had Marlboro Light cigarettes in the Hummer.  *Id*. at 65.  He noticed that Shelton had a key chain with a long bullet hanging from it.  *Id*. at 88.  He also noticed that Shelton had a laptop computer.  *Id*. at 63.

OC became suspicious when he saw a pornographic picture displayed on the computer, and he asked to see the badge again.  *Id*. at 63-65.  The pornography OC saw on Shelton's computer was a picture of two men engaged in oral sex.  *Id*. at 87.  Shelton then let OC out of the Hummer, telling him he would show him the badge again, and took him to the back passenger seat, and had him sit there so he could remove the handcuffs.  *Id* at 65.  Shelton then pushed OC down, climbed into the Hummer and onto OC, and tightened the handcuffs.  *Id*.  OC testified as follows about what then happened:

Q.      Where did he push you?

A.      Onto my skateboard.  Right there, like, in the back seat.

Q.      Did you hit any part of your body on it?

A.      On my eyebrow.  But that was later on.

Q.      Okay.

A.      But he just laid me down, and then, he made me squeeze his testicles.  Like, I was scared because he pulled down my pants, supposedly to search me.  And like, he searched my crotch, my butt crack and everything.  And then, he pulled down my pants, and then, he pulled down his pants.  And then, he made me squeeze his testicles.  And I was kicking and screaming, and then, he slammed my head onto my skateboard on my eyebrow.  And then, he told me that if I -- if I wanted to live or die that he could just pull the trigger, so I better do as he says.  And I was scared or something.  Yeah, I was scared.

Q.      Is that the first time he mentioned having a gun?

A.      Yeah, that was the first time.  And then, he flipped over with my belly facing up, and he was leaning each knee on the side of my stomach, and then, he faced me up, and then, he made me give him oral sex.

1    Q.    By that, you -- I need you to tell me what act he did.

2    A.    Like what?

3    Q.    What part of his body?  What part of your body?

4    A.    Oh, his penis and my mouth.

5    Q.    How long did that happen?

6    A.    Like, 20 seconds.  To me, it felt like 20 seconds.

7    Q.    Okay.  What were you doing when that was happening?

8    A.    I was closing my eyes and just praying, I guess, so I didn't die.

9    Q.    Were you aware of anything else going, that was going on around you?

10   A.    Yeah.  He said he was going to pull out a Polaroid camera and, like he -- I
     guess before I closed my eyes, I seen a flash.  Then, I closed my eyes so, like, in case
11   he was going to take another picture or whatever if he did.  Like, he wouldn't had,
     like, be able to see my eyes.

12                                      *    *    *

13   Q.    How did that end?

14
     A.    Then, he got off of me.  And he took me down, said he was going to take off
15   my handcuffs.  He took off my handcuffs.

16   Q.    What made him get off of you?

17   A.    I don't know.  Oh he had already ejaculated in my mouth.

18   Q.    Where did he ejaculate?  Okay.

19   A.    And then, he --

20   Q.    I'm sorry.  He ejaculated --

21   A.    In my mouth.  Yeah.

22   Q.    Did he say anything to you when that happened?

23   A.    He told me to swallow it, and I did because I was scared.  You know, I didn't
     want to die.  And he got off of me.  Then, he set me on the dirt, on the back.  He -- I
24   was standing.  And he said he was going to take off my handcuffs.  And he took them
     off, and he told me to just run to the -- a wall that was around there that had a hole to
25   where I could go home.  I ran there, and there was no hole, and he turned the truck
     around, and he left.

26
                                        *    *    *

1    Q.    What happened then?

2    A.    Then he faced -- then, I went home and told my mom about it, and then, she
     called the cops on her phone.

3

4  *Id*. at 65-68.

5    OC testified that the police came to his home, and took a statement, and took photographs of

6  him, including photographs of red marks left by the handcuffs on his wrists.  *Id*. at 69-70, 100-01.

7  OC gave the police a description of the Hummer, and a description of Shelton, and the clothing, hat,

8  and sunglasses he was wearing.  *Id*. at 70-71.  OC told the police that Shelton had told him that his

9  friends called him "Johnny."  *Id*.  The police took OC to the place where he had been sexually

10  assaulted, and they took photographs there.  *Id*. at 72.  OC testified that when he was running from

11  the place where he was attacked, he used his shirt to wipe out his mouth, and the police took that

12  shirt.  *Id*. at 78, 87.  The police also swabbed OC's mouth.  *Id*. at 87-88.  OC testified that, a few

13  days later, he was taken to give a description of the attacker to a sketch artist.  *Id*. at 85-86.

14    The prosecution then called OC's mother to the witness stand.  Exhibit 55C, pp. 117-28.  She

15  testified that when OC returned home on May 21, 2006, after going out by bus to buy skateboard

16  tape, he came into the house screaming and crying, and told her to call the police.  *Id*. at 122-23.

17  OC told his mother what had happened, and was scared that he was being followed.  *Id*. at 123.  She

18  testified that the police arrived, took statements and photographs, and then took OC to where the

19  sexual assault had taken place.  *Id*. at 123-24.  She testified that OC's nose was red, he had a scratch

20  on his forehead, and he had marks on his wrists from the handcuffs.  *Id*. at 124.  When asked if she

21  noticed any changes in OC after the incident, she testified:

22    A.    Before May the 21st, his – well, he was a peaceful child.  He skateboards a lot.
     After May 21st, he doesn't skate as much.  He's always sad.  He's always scared.  He

23    tries to be strong so I don't realize he's sad, but I do notice it.

24  *Id*. at 125-26.

25    Next, the prosecution called to the witness stand Marnie Carter, who had been a crime scene

26  analyst with the Las Vegas Metropolitan Police Department (LVMPD).  Exhibit 55C, pp. 129-46.

5

1   Carter testified that on the night of May 21, 2006, she went with OC and LVMPD Detective Janice

2   Blasko, to the place where OC had been assaulted. *Id*. at 134-35.  Carter testified that at that location

3   she observed and photographed footprints and tire prints. *Id*. at 135-46.

4       The prosecution then called Wendy Wilder.  Exhibit 55C, pp. 147 - Exhibit 55D, p. 170.

5   Wendy Wilder was a friend of Shelton's. *Id*. at 148-49, 153.  She testified that Shelton had planned

6   to move into a home with her and her two sons, who were then fifteen and thirteen years old. *Id*. at

7   150-53.  She testified that Shelton was visiting them in Las Vegas between May 14 and 23, 2006.

8   *Id*. at 150, 157.  She testified that Shelton left Las Vegas on the evening of May 23, 2006. *Id*. at 157.

9   She testified that she spoke with Shelton on May 24, 2006, and that she told him that it was

10  dangerous for him to be driving his black Hummer wearing his black LA Dodgers hat, because a

11  fourteen-year-old boy had been molested by a man in such a vehicle with such a hat. *Id*. at 158-59.

12  The next day, May 25, 2006, feeling nervous about Shelton because he planned to move in with her

13  and her two boys, Wendy called the police.  Exhibit 55C, p. 160 - Exhibit 55D, p. 162.  She told the

14  police that Shelton had a black Hummer, was wearing a black LA Dodger's hat, and had a long

15  bullet on a keychain.  Exhibit 55D, pp. 163-64.  She testified that she knew Shelton to smoke. *Id*. at

16  165.  She testified that she had seen a police badge in Shelton's Hummer. *Id*.  She described

17  Shelton's sunglasses. *Id*. at 165-66.  She also testified that Shelton mentioned that he had a gun in

18  his vehicle. *Id*. at 166.

19      Next, the prosecution called Wade Wilder, Wendy's youngest son, who was thirteen in May

20  2006.  Exhibit 55D, pp. 171-78.  Wade remembered Shelton coming to his home in May 2006, and

21  that he planned to move in with them. *Id*. at 172-73.  He testified that Shelton had a black Hummer,

22  and a keychain with a long bullet. *Id*. at 174.  He testified that Shelton wore a black LA Dodgers hat,

23  and he described Shelton's sunglasses. *Id*. at 175.  He testified that he saw a computer in Shelton's

24  Hummer. *Id*. at 175-76.

25      The prosecution then called Robert Montanez, a Corona, California, police officer.  Exhibit

26  55D, pp. 179-87.  Officer Montanez was involved in arresting Shelton in Corona, and he described

that arrest. *Id.* at 179-82.  Montanez testified that Shelton was cooperative when he was arrested, and described Shelton's demeanor as "indifferent" and unsurprised. *Id.* at 182, 187.  Montanez testified that Shelton was searched when he was taken into custody. *Id.* at 185.   Montanez testified that Shelton had, in his right front pocket, what appeared to be a California driver's license with his picture on it, but with the name "Johnny Wade." *Id.* at 185-86.

Next, the prosecution called Janice Blasko, an LVMPD detective.  Exhibit 56A, p. 19 - Exhibit 56B, p. 59.  Detective Blasko testified that she was dispatched to OC's residence on the night of May 21, 2006.  Exhibit 56A, pp. 20-21.  She testified that she conducted a tape-recorded interview of OC. *Id.* at 21-22.  She testified that she noticed red marks on OC's wrists, which looked to her like handcuff marks, and she instructed patrol officers on the scene to take photographs of those marks. *Id.* at 23-24, 50.  She testified that, based on information OC gave her, she collected his shirt from him. *Id.* at 24-28.  She testified that she took OC, along with Marnie Carter, to the scene of the sexual assault to gather evidence. *Id.* at 28-30.  She testified that she took swabs of OC's mouth. *Id.* at 30-32.  She testified that she went to the Copeland's Sports store near Boulevard Mall to confirm that OC had been there. *Id.* at 32.  She testified that, at Copeland's Sports, she obtained a receipt showing the purchase of skate board grip tape at 7:40 p.m. on May 21, 2006. *Id.* at 32-36, 44.

The prosecution then called LVMPD Detective Raymond Spencer.  Exhibit 56B, pp. 61-97.  Detective Spencer testified that on May 23, 2006, he drove with OC and viewed the locations where he had been with Shelton, following the route that Shelton drove. *Id.* at 65-73.  He testified that OC told him about seeing Shelton's keys with the long bullet on the key chain. *Id.* at 71-72.  Detective Spencer testified that on May 24, 2006, the police released, to the media, information regarding the description of the suspect and his vehicle, along with a composite drawing of the suspect. *Id.* at 76-77.  Detective Spencer testified that the next day, May 25, 2006, he learned that Wendy Wilder had called the police and identified Shelton, and provided a detail that had not been released to the media:  she described Shelton's key chain with the long bullet on it. *Id.* at 77.  Detective Spencer

1    testified that, as a result of the information provided by Wendy Wilder, Shelton was arrested in

2    Corona.  *Id*. at 78.  Detective Spencer testified that, following Shelton's arrest, he participated in

3    searching Shelton's Hummer.  *Id*. at 79.  He testified that, in that search, the police found:  several

4    police badges, handcuffs, sunglasses matching the description given by OC, a firearm, Marlboro

5    Light cigarettes, a laptop computer, and a Polaroid camera.  *Id*. at 79-81, 85.  Also, Shelton's key

6    chain, with the keys to the Hummer, had a long bullet attached to it.  *Id*.  Detective Spencer testified

7    that he was present when a buccal swab was taken of Shelton's mouth.  *Id*. at 81-82.

8        Next, the prosecution called Joseph Szukiewicz, a crime scene analyst with LVMPD.

9    Exhibit 56B, p. 98 - Exhibit 56C, p. 140.  Szukiewicz testified that he traveled to Corona on

10   May 27, 2006, along with Detective Spencer and a Detective Matt Demas, to conduct a search of

11   Shelton's Hummer.  *Id*. at 103.  Detective Szukiewicz testified about finding the following items in

12   Shelton's Hummer:  a loaded handgun in a holster, a laptop computer, Marlboro Light cigarettes,

13   several police badges, sunglasses matching the description given by OC, handcuffs, and a Polaroid

14   camera.  *Id*. at 108-27, 135-36.  In addition, Szukiewicz testified that there was a long bullet on the

15   key chain with the keys to the Hummer.  *Id*. at 118-19.  Szukiewicz testified that he and Detective

16   Spencer photographed Shelton, and took a buccal swab from his mouth.  *Id*. at 128, 136-37.

17       The prosecution then called Michael Perkins, an LVMPD crime scene analyst supervisor.

18   Exhibit 56C, p. 141 - Exhibit 56D, p. 154.  Perkins testified that on June 1, 2006, he took exemplar

19   tire track prints from the tires on Shelton's Hummer.  Exhibit 56C, p. 146 - Exhibit 56D, p. 154.

20       Next, the prosecution called Joel Geller, a latent print examiner with the LVMPD.  Exhibit

21   56D, pp. 154-67.  Geller compared photographs of tire tracks found at the crime scene to the

22   exemplar tire track prints from the tires on Shelton's Hummer.  *Id*. at 158-62.  Geller testified that

23   the tire tracks at the crime scene were similar to -- had the same tread design as -- the exemplars

24   taken from Shelton's Hummer.  *Id*. at 162-63.  Geller also compared a photograph of OC's shoes to a

25   photograph of footprints found at the crime scene, and found them to be similar.  *Id*. at 163-64.

26

1    The prosecution next called Kelly Gauthier, a forensic scientist in the LVMPD's DNA unit.

2   Exhibit 56D, pp. 168-193.  Gauthier testified that semen was detected in the swab taken from OC's

3   mouth.  *Id*. at 183, 191.  She testified that, based on comparison done between the swab from OC's

4   mouth and the swab from Shelton's mouth, Shelton could not be excluded as a contributor of DNA

5   found in OC's mouth.  *Id*. at 181-83.  Gauthier also testified that sperm was found on the shirt that

6   OC used to wipe out his mouth after he was sexually assaulted.  *Id*. at 187-90, 193. Gauthier testified

7   that DNA found on OC's shirt matched Shelton's DNA.  *Id*. at 187-90.

8         The prosecution then rested its case.  Exhibit 57A, p. 12.

9         The defense called as a witness Briana Legaspi, a friend of Shelton's in California.  Exhibit

10  57A, pp. 15-23.  Shelton had stayed at her home the night before he was arrested, and she and her

11  mother were present, with Shelton in his Hummer, on May 26, 2006, when he was pulled over and

12  arrested.  *Id*. at 16-17.  She testified that, after Shelton was arrested, she allowed the police to search

13  her home.  *Id*. at 21.  On cross-examination, Legaspi testified that she believed that Shelton was in

14  Las Vegas prior to his arrest.  *Id*. at 21-22.  On cross-examination, Legaspi also testified that she had

15  some of her belongings in the Hummer, but the police badges, handcuffs, gun, and key chain were

16  not hers.  *Id*. at 22.

17        Shelton was then called to testify.  Exhibit 57A, p. 23.  However, before he testified, the jury

18  was removed from the courtroom, and there was a conference between counsel and the court.  *Id*. at

19  23-43.  The defense then made a motion in limine "to preclude the District Attorney from making

20  reference to Mr. Shelton's HIV status ... [if] he takes the stand and raises the issue of consent with

21  respect to the sexual contact he's alleged to have had with [OC]."  *Id*. at 27.  The trial court denied

22  the motion in limine, ruling that if Shelton claimed his sexual contact with OC was consensual, then,

23  especially given the evidence that semen was found in OC's mouth and sperm with Shelton's DNA

24  was found on the shirt he used to wipe out his mouth, and the evidence that Shelton told OC to

25  swallow his ejaculate, the question whether Shelton informed OC of his HIV/AIDS status was

26

1    relevant to the question whether OC consented.  *Id.* at 32-38.  In light of that ruling, Shelton decided

2    not to testify.  *Id.* at 39-41.  The defense then rested its case.  Exhibit 57A, p. 44.

3    　　　　The jury found Shelton guilty of first degree kidnapping, sexual assault upon a minor under

4    the age of sixteen, battery with intent to commit sexual assault, and use of a minor in the production

5    of pornography; the jury found Shelton not guilty of robbery.  Exhibit 57 B, p. 102; Exhibit 59.

6    Shelton was sentenced, for the kidnapping, to life in prison with the possibility of parole after five

7    years; for the sexual assault, to life in prison with the possibility of parole after twenty years; for the

8    battery, to life in prison with the possibility of parole after five years; and for the use of a minor in

9    the production of pornography, to life in prison with the possibility of parole after five years.  Exhibit

10   62, p. 23; Exhibit 63.  The sentences run consecutively.  *Id.*

11   　　　　Shelton appealed, and on January 30, 2009, the Nevada Supreme Court affirmed.  Exhibit 82.

12   　　　　Shelton then filed, in the state district court, a post-conviction habeas petition.  Exhibits 85,

13   86, 87, 91.  The state district court denied the petition on September 16, 2010.  Exhibit 97.  Shelton

14   appealed, and the Nevada Supreme Court affirmed.  Exhibit 113.

15   　　　　On September 18, 2012, Shelton filed, in this court, a federal petition for writ of habeas

16   corpus pursuant to 28 U.S.C. § 2254 (ECF No. 1).  Shelton subsequently filed an amended habeas

17   petition (ECF No. 6).  Respondents filed an answer (ECF No. 8), and Shelton filed a reply (ECF No.

18   38).  Shelton's amended habeas petition is before the court with respect to the merits of his claims.

19   Standard of Review

20   　　　　Because this action was initiated after April 24, 1996, the amendments to 28 U.S.C. § 2254

21   enacted as part of the Antiterrorism and Effective Death Penalty Act (AEDPA) apply.  *See Lindh v.*

22   *Murphy,* 521 U.S. 320, 336 (1997); *Van Tran v. Lindsey*, 212 F.3d 1143, 1148 (9th Cir.2000),

23   overruled on other grounds by *Lockyer v. Andrade*, 538 U.S. 63 (2003).  28 U.S.C. § 2254(d) sets

24   forth the primary standard of review under AEDPA:

25   　　　　　　An application for a writ of habeas corpus on behalf of a person in custody
            pursuant to the judgment of a State court shall not be granted with respect to any
26   　　　　claim that was adjudicated on the merits in State court proceedings unless the
            adjudication of the claim --

1
2

          (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

3
4

          (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

5   28 U.S.C. § 2254(d).

6       A state court decision is contrary to clearly established Supreme Court precedent, within the

7   meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set

8   forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially

9   indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result

10  different from [the Supreme Court's] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)

11  (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694

12  (2002)).

13      A state court decision is an unreasonable application of clearly established Supreme Court

14  precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct

15  governing legal principle from [the Supreme Court's] decisions but unreasonably applies that

16  principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S.

17  at 413).  The "unreasonable application" clause requires the state court decision to be more than

18  incorrect or erroneous; the state court's application of clearly established law must be objectively

19  unreasonable.  *Id*. (quoting *Williams*, 529 U.S. at 409).

20      The Supreme Court has further instructed that "[a] state court's determination that a claim

21  lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

22  correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 786

23  (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The Supreme Court has stated

24  "that even a strong case for relief does not mean the state court's contrary conclusion was

25  unreasonable."  *Id*. (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, __ U.S. __, 131

26  S.Ct. 1388, 1398 (2011) (describing the AEDPA standard as "a difficult to meet and highly

1   deferential standard for evaluating state-court rulings, which demands that state-court decisions be

2   given the benefit of the doubt" (internal quotation marks and citations omitted)).

3        The state court's "last reasoned decision" is the ruling subject to section 2254(d) review.

4   *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010).  If the last reasoned state-court decision

5   adopts or substantially incorporates the reasoning from a previous state-court decision, a federal

6   habeas court may consider both decisions to ascertain the state court's reasoning.  *See Edwards v.*

7   *Lamarque*, 475 F.3d 1121, 1126 (9th Cir.2007) (en banc).

8        If the state supreme court denies a claim but provides no explanation for its ruling, the federal

9   court still affords the ruling the deference mandated by section 2254(d); in such a case, the

10  petitioner is entitled to federal habeas corpus relief only if "there was no reasonable basis for the

11  state court to deny relief."  *Harrington*, 131 S.Ct.  at 784.

12  Analysis

13       Ground 1

14       In Ground 1 of his amended habeas petition, Shelton claims that his federal constitutional

15  rights were denied because he received ineffective assistance of trial counsel.  *See* Amended Petition

16  (ECF No. 6), pp. 4-6.  Specifically, in Ground 1, Shelton claims that his trial counsel was ineffective

17  for failing to obtain a ruling, before trial, regarding whether the State could cross-examine Shelton

18  regarding his HIV/AIDS status if Shelton testified and claimed that the sexual contact with OC was

19  consensual.  *See id*.  Shelton appears to claim that his counsel did not effectively argue the issue.  *See*

20  *id*. at 5.  Shelton also claims that he was prejudiced because his trial counsel conceded that he had

21  contact with OC, and told the jury that he would testify regarding that contact, then called him to the

22  stand to testify, but had to change course and not present his testimony after the trial court ruled that

23  his HIV/AIDS status would be admissible on cross-examination if he testified that OC consented.

24  *See id*. at 4-6.

25       In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court propounded a two

26  prong test for analysis of claims of ineffective assistance of counsel:  a petitioner claiming

12

ineffective assistance of counsel must demonstrate (1) that his attorney's representation "fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688; *see also id*. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.  The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id*. at 689.  Thus, to show deficient performance and satisfy the first prong of *Strickland*, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*.  "Failure to satisfy either prong of the *Strickland* test obviates the need to consider the other." *Chapman v. Lampert*, 371 Fed.Appx. 742, 746 (9th Cir.2010) (citing *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir.2002)); *United States v. Torres–Guardado*, 502 Fed.Appx. 654, 655 (9th Cir.2012); *see also Strickland*, 466 U.S. at 697.

Shelton presented this claim to the Nevada Supreme Court on the appeal from the denial of his state-court habeas petition (*see* Appellant's Opening Brief, Exhibit 107, pp. 21-30), and the Nevada Supreme Court ruled as follows:

> First, appellant claims that trial counsel failed to properly object to the admissibility of appellant's HIV/AIDS status prior to trial.  Specifically, appellant claims that trial counsel should have argued that appellant's HIV/AIDS status did not impact the victim's ability to consent and, therefore, the district court should not have ruled that it was admissible for cross-examination.  [Footnote: We note that trial counsel did file a motion in limine prior to trial to try to limit the admissibility of appellant's HIV/AIDS status.]  Appellant fails to demonstrate that he was prejudiced because he fails to demonstrate a reasonable probability of a different outcome at trial had trial counsel made that argument.  There was overwhelming evidence presented at trial that appellant was the perpetrator and that the contact was against the will of the victim.  Therefore, the district court did not err in denying this claim.

> Second, appellant claims that trial counsel was ineffective for conceding that appellant had contact with the victim.  Appellant fails to demonstrate prejudice because he fails to demonstrate a reasonable probability of a different outcome at trial had trial counsel not conceded that appellant had contact with the victim.  There was overwhelming evidence presented at trial that the victim and appellant met that night.  Further, the statements made by trial counsel did not imply sexual contact. Therefore,

1    the district court did not err in denying this claim.

2            Third, appellant claims that trial counsel was ineffective for informing the jury
     that appellant would testify.  Appellant fails to demonstrate prejudice because he fails
3    to demonstrate a reasonable probability of a different outcome at trial had trial
     counsel not told the jury that appellant would testify.  There was overwhelming
4    evidence that appellant committed these crimes.  Therefore, the district court did not
     err in denying this claim.

5    Order of Affirmance, Exhibit 113, pp. 2-3.

6
            The Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of,
7
     clearly established federal law, as determined by the Supreme Court of the United States, and was
8
     not based on an unreasonable determination of the facts in light of the evidence presented.  *See* 28
9
     U.S.C. § 2254(d).
10
            With respect to the evidentiary ruling underlying this claim -- the state courts' ruling that, if
11
     Shelton testified and claimed that OC consented, the prosecution could inquire on cross-examination
12
     about Shelton's HIV/AIDS status -- that ruling was a matter of state evidence law, and is beyond the
13
     scope of this federal habeas action.  Shelton does not claim that his federal constitutional rights were
14
     violated by that evidentiary ruling.
15
            Further, Shelton does not show that his trial counsel was ineffective with respect to his
16
     argument regarding the evidentiary issue.  Shelton's trial counsel filed a pre-trial motion in limine
17
     seeking to exclude mention of Shelton's HIV/AIDS status, and that motion was granted without any
18
     indication whether Shelton's HIV/AIDS status would be excluded if Shelton testified that OC
19
     consented.  *See* Exhibit 42 (motion in limine); Exhibit 46, pp. 14-15 (ruling on motion in limine).
20
     During trial, before commencing the examination of Shelton in his defense case, Shelton's trial
21
     counsel again raised the issue, and sought a ruling of the trial court with respect to whether the door
22
     would be open to cross-examination regarding Shelton's HIV/AIDS status if Shelton testified that
23
     OC consented.  *See* Exhibit 57A, pp. 27-38.  Counsel and the court then had the following exchange:
24
            THE COURT:  Okay.  And now I know you wish to make a motion.
25
            MR. COLUCCI [Shelton's trial counsel]:  Yes, Your Honor.  I would make a
26       motion in limine to preclude the District Attorney from making reference to Mr.
         Shelton's HIV status.  If he takes the stand and raises the issue of consent with respect

                                            14

1    to the sexual contact he's alleged to have with [OC].

2         The Court has indicated, based on representations made by the State and -- and after considering representations made by the defense, that the Court would allow the State to make reference to the HIV status of Mr. Shelton if he takes the stand and admits that he had contact with [OC].

         THE COURT:  Well, to be clear, I said the State would be permitted to ask Mr. Shelton, "Did you tell [OC] that you were HIV positive before you had this," -- and again, I'm assuming the defense was going to be it was a consensual act; is that accurate?

7         MR. COLUCCI:  Right. That would've -- that's what it would've been.

8         THE COURT:  Okay.  So in order for it to be a consensual act, I would have allowed the State to cross examine Mr. Shelton regarding whether he told this 14-year-old whether he was HIV positive and they were about to have unprotected sexual contact.

         MR. COLUCCI :  Right.  That's my understanding --

11         THE COURT: Okay.

12         MR. COLUCCI:  From our discussions.  Based on that ruling, and I'm assuming [the] Court's going to make a ruling on my in limine -- assuming that that motion is denied, Mr. Shelton has made the decision not to testify in this case.

         THE COURT:  Okay. And again, it -- and just so the record's clear, the offer of proof was that Mr. Shelton was going to admit that they were in the Hummer together.

16         MR. COLUCCI:  I can go through what --

17         THE COURT:  Would you, please?  So the record is clear?

         MR. COLUCCI:  I would be happy to.  Sure.  If Mr. Shelton were allowed to -- if Mr. Shelton testified, he would testify that on May 21, 2006, that he met [OC] at the Boulevard Mall.  That they had a discussion.  That [OC] got into the Hummer and traveled with Mr. Shelton to one or more locations.  That he -- [OC] -- requested a ride home, which Mr. Shelton was going to give him.  That at some point, they discussed having sexual contact.  That the sexual contact was mutual and consensual.

22                          \*    \*    \*

23         ... And that sexual contact was going to be consensual.  Sexual contact was going to be mutual masturbation.  Mr. Shelton would've also testified that he --

24                          \*    \*    \*

26         Mr. Shelton would have testified that he did not rob [OC].  He did not photograph him.  He did not batter him.  He did not handcuff him, and he didn't threaten him.  And because of the Court's ruling on the issue of his HIV status -- you

didn't rule on the status. You ruled on the ability of the State to question him about that issue, with respect to the consent issue. Because of that, he has decided not to testify in this case.

MS. HOLTHUS [prosecutor]: If we could just be heard. Our position is, had he taken the stand, we were watching for essentially three doors to open in his direct examination. One of which was a denial of -- an admission of sexual contact. We do have phone calls wherein Mr. Shelton has told people that, "If my DNA was on that kid, it was planted." Secondarily, with respect to the pornography count, had he denied taking any picture of the child, we had recovered various images from his computer that had been previously deleted, including some -- what appear to be, at least -- young boys pornography, within the age range of this child.

And also, possibly more importantly are some still shots that appear they could have been taken by the Defendant, of three individuals -- adults -- although at least one we believe to be eighteen or nineteen, who were photographed and appear to be unconscious at the time. One of whom is handcuffed in the back seat of a vehicle with his pants down.

Another young male, who you see sitting up initially -- and again, adult -- but you see initially sitting up. Thereafter, you see him blindfolded, apparently unconscious or sleeping, with a penis by his mouth. And at least one other.

We have not previously sought to admit these or to talk about them in the case. However, had he taken the stand and denied taking the picture --

*   *   *

Anyway, we hadn't sought to bring those in prior -- we weren't going to address the probative and prejudicial -- but certainly should he take the stand, we absolutely would think we have the right to talk to him about all the cameras found in his car, including the Polaroid camera in his car, what the flash was that [OC] saw. And we absolutely would've sought, to introduce evidence of these images that had been previously on a lap top that was recovered from the vehicle.

And thirdly, obviously, is the HIV status. We had initially charged in this case -- we were unable to get the evidence that was required by statute to prove the charge itself. That is, where his testing had undergone -- where he had undergone the testing for these purposes. The statute's very specific in terms of we had to show that he was made aware of it, due to a certain test. Our belief is his initial testing was in California. We were never able to locate the doctor because of privacy laws and HIPAA laws. And particularly in the area of HIV status, we were never able to secure the records sufficient t.o proceed on that charge.

Moreover --

THE COURT: Is it -- I thought there was an admission from Mr. Shelton himself.

MS. HOLTHUS: There -- we know he's HIV positive.

THE COURT: Okay.

MS. HOLTHUS:  There are court records, public records, opinions out of California from a prior civil suit, wherein there are admissions of he's [sic] HIV positive.  Pursuant to the statute in this case, the child was notified because the [statute] requires that if a child's a victim of ... sexual abuse, the -- any individual arrested must be tested by the Public Health Department.  Those results must be provided to that victim.  That was done in this case.  And so we were aware that he's HIV positive.

Moreover, there was another search warrant that we have, again, stayed completely away from in this case, for search of a bag that was found in the Hummer as well.  And in that, bag contained a number of medications that sources say are the treatment and containment of HIV.  So we were very comfortable at all stages that that existed.  Again, he had raised it previously, that it wasn't going to go into, was prejudicial probative and whatnot.  We left it alone.

Our position; however, is if he's going to take the stand and try to say that this fourteen year old kid wanted to have consensual sex with him, we need to be able to open that door up.  Did you advise him that you were HIV positive?  Did you give him the option?  Did you reach over to the console where the condoms were located, and put one on?  Was --

THE COURT:  So there were condoms –

*    *    *

MS. HOLTHUS:  In the vehicle.  You can see in some of the pictures.

THE COURT:  Based upon what -- based upon what [OC] said?  Because the pictures were taken when he returned to California.

MS. HOLTHUS:  Correct -- well, I mean, the inference would be --

THE COURT:  Okay.

MS. HOLTHUS:  That he didn't just put the condoms in there.  Or did he pull one out of his pocket?

THE COURT:  Okay.

MS. HOLTHUS:  Or whatever.  Two people have consensual sex, generally speaking, you would expect that that would be discussed.  Before an exchange of bodily fluids, you would expect two people to say, "Look, I'm HIV positive, do you want me to use a condom?  Or is it okay if I don't?"

I mean, I'm not saying it's the end all, but it absolutely becomes relevant on any issue regarding consent in this case.  And so our position would've been we -- that would've been fair game for cross examination.

THE COURT:  Would you like to add anything?

MR. COLUCCI:  I just think that -- I think the Court indicated that if there

1    was non-disclosure of his HIV status to [OC], prior to having the sexual contact, that that would negate any -- basically, informed consent.

2

3    THE COURT: No. I don't think that I said that. And if -- I don't think I said that, and you have misinterpreted what I said. But consent, by definition means, I'm consenting. I know everything, and I'm consenting. And if you're going to have unprotected sex -- someone's going to put their penis in your mouth or where ever, bodily fluids are going to be exchanged, and you don't tell them that you're HIV positive, that goes to consent.

4

5

6    I mean, I think if your defense is the child consented, then it's fair game for the State to say, "Well, did you tell the child you were HIV positive?" Because it would be hard for me to believe that anybody would say, "Okay, go ahead," knowing what we all know about. it's incurable, it's fatal, there's no cure. There's just medications and -- and the horrible, horrific disease that it is.

7

8

9    So -- and even a fourteen year old knows about HIV. Because, unfortunately, we have to educate them at a young age because of that disease. So, clearly and unequivocally, the fact that he was HIV positive would go to consent.

10

11    If his defense is consent, this child said, "Yeah, I want to do it." Well, did you have a discussion with the child ... that you were HIV positive? That would go to consent.

12

13                  *   *   *

14    ... And so -- and again, I think that if he gets on the stand and admits that [OC] was in his vehicle, and with the testimony that we had yesterday that there was semen in the child's mouth, that Mr. Shelton could not be excluded as being the donor of that semen. And then the semen on the t-shirt that the DNA expert said was a perfect match to Mr. Shelton. I think that clearly the State would have the opportunity and the defense would not be able to limit the State's ability.

15

16

17

18    And again, the trial is about a search for the truth. And if consent is the defense, what did you tell the 14-year-old? So there's no question that sexually transmitted diseases go to whether you're consenting to unprotected sex. And also, the child testified not only was it unprotected, but that the child -- and again, this is just what the child testified to, that he was told to swallow it. To swallow the ejaculation.

19

20

21    So -- I mean, no doubt in my mind that it would be relevant. And even when weighing the probative value versus the prejudicial effect, I don't think that the prejudicial effect would substantially outweigh the probative value in this case.

22

23    MR. COLUCCI: So the Court's denying my motion in limine?

24    THE COURT: I'm going to deny the motion. And so based upon that, Mr. Shelton is not going to take the stand, because I'm assuming he doesn't want the jury to hear that evidence.

25

26    MR. COLUCCI: Correct.

1  Exhibit 57A, pp. 27-38; *see also id*. at 39-41 (trial court's canvass of Shelton regarding his decision

2  not to testify given the trial court's ruling on motion in limine).

3       Shelton makes no showing that his trial counsel was ineffective with respect to the motion in

4  limine, either before or during his trial.

5       Plainly, if Shelton had testified that he was with OC on the night of May 21, 2006, and that

6  OC consented to sexual contact between them, the cross-examination would have been devastating.

7  Not only would Shelton's HIV/AIDS status have come into evidence, to undermine his consent

8  defense, but he likely would also have been cross-examined regarding his cameras and the

9  pornographic photographs that he had in his possession, and regarding previous inconsistent

10  statements to the effect that he did not have sexual contact with OC.  Shelton's trial counsel was able

11  to obtain a preview of the cross-examination, and avoid exposing Shelton to it.

12       Regarding trial counsel's concession that Shelton had contact with OC (*see* Exhibit 57A,

13  pp. 13-14), it is inconceivable that Shelton was prejudiced by that concession.  There was

14  overwhelming evidence showing that OC was with Shelton, and that they had sexual contact, on the

15  evening of May 21, 2006.  *See* discussion of evidence at trial, above, at pp. 2-9.  That night, semen

16  was found in a swab taken from OC's mouth, and sperm containing Shelton's DNA was found on a

17  shirt used by OC to wipe out his mouth.  *See* Exhibit 56D, pp. 187-90.  Given the evidence, trial

18  counsel's concession that Shelton had contact with OC was a statement of the obvious, and it did not

19  prejudice Shelton.

20       With regard to Shelton's claim that he was prejudiced by his trial counsel's statement to the

21  jury that Shelton would testify, and his calling of Shelton to testify, before raising the issue of the

22  anticipated cross-examination, and before having to change course, and not have Shelton testify, the

23  court agrees with the state court that Shelton was not prejudiced.  At most, the effect was to highlight

24  somewhat the fact that Shelton did not testify.  However, the jury was properly instructed as follows:

25            It is a constitutional right of a defendant in a criminal trial that he may not be
          compelled to testify.  Thus the decision as to whether he should testify is left to the
26       defendant on the advice and counsel of his attorney.  You must not draw any
          inference of guilt from the fact that he does not testify, nor should this fact be

1   discussed by you or enter into your deliberations in any way.

2   Exhibit 58, Instruction 13.  It is presumed that jurors follow their instructions.  *See Weeks v.*

3   *Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *Drayden v.*

4   *White*, 232 F.3d 704, 713 (9th Cir.2000), *cert. denied*, 532 U.S. 984 (2001).  In accord with that

5   presumption, and in light of the strong evidence against Shelton at trial (*see* discussion of evidence at

6   trial, above, at pp. 2-9), this court concludes that the apparent indecision of the defense before the

7   jury, about whether or not Shelton would testify, did not cause any prejudice to Shelton.

8       In his reply, Shelton  asserts a new prejudice theory, requests an evidentiary hearing with

9   respect to it, and agues that, in state court, he was denied the opportunity to develop the facts

10  regarding it.  *See* Reply(ECF No. 11), pp. 10-12.  Shelton argues:

11          There is a reasonable probability that Shelton would have accepted a plea
        offer, if he had been advised, if his counsel had determined, pre-trial, that it was not
12      viable for him to testify.  Albeit, the nature and extent of plea negotiations is
        unknown, due to the fact that there was no evidentiary hearing, clearly, Shelton would
13      have been more likely to consider a plea deal if he knew, pre-trial, that he would not
        be able to testify in his own defense.  Likewise, counsel's advice and approach would
14      have been different if he knew his client could not testify in his own defense; he
        would have been more likely to counsel his client to negotiate the case rather than to
15      contest his guilt.

16  *Id*. at 11.  In the state district court, Shelton made a request for an evidentiary hearing; however, in

17  the Nevada Supreme Court, he did not argue that an evidentiary hearing should have been granted on

18  the question whether he was prejudiced vis-a-vis an opportunity to negotiate a plea, and he never

19  made any showing of what evidence he could produce at an evidentiary hearing with respect to that

20  issue.  *See* Appellant's Opening Brief, Exhibit 107, pp. 40-42; Appellant's Reply Brief, Exhibit 112.

21  At any rate, even if this court were to accept Shelton's contention that in state court he was denied

22  the opportunity to develop the factual basis for this argument, he is not entitled to an evidentiary

23  hearing in this case, because his contention -- that he was prejudiced because he would have

24  negotiated a plea if he had determined before trial that he would not testify -- is wholly speculative,

25  conclusory, and unsupported.  It is also belated; Shelton only made the argument that he was

26  prejudiced vis-a-vis pre-trial plea negotiations, and his request for an evidentiary hearing regarding

it, for the first time in this case in his reply.  *See* Amended Petition, pp. 4-7.  Shelton has never in this case made any specific factual allegations regarding any plea negotiations that were had, or that might have been possible, before trial.  *See id.*; *see also* Reply, p. 11.  Furthermore, the argument is unsupported by any proffer of any evidence whatsoever suggesting that Shelton would have been able, and willing, to negotiate a plea if he had determined before trial that he would not testify.  *See id.*  A habeas petitioner may be entitled to an evidentiary hearing if he alleges facts which, if proven, would entitle him to relief, and if he was denied the opportunity to fully and fairly develop those facts in state court.  28 U.S.C. § 2254(e)(2); *Earp v. Ornoski*, 431 F.3d 1158, 1167 (9th Cir.2005).  However, the facts alleged must be specific, so as to form the basis of a colorable claim for relief.  *See Tilcock v. Budge*, 538 F.3d 1138, 1145 (9th Cir.2008).  Conclusory, unsupported, and speculative allegations are insufficient to warrant an evidentiary hearing.  *See Gonzalez v. Knowles*, 515 F.3d 1006, 1014 (9th Cir.2008); *Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir.2001).  Shelton is not entitled to an evidentiary hearing regarding his belated, speculative, conclusory, and unsupported contention that, had he known before trial that he was not going to testify, he would have negotiated a plea agreement.

In sum, then, this court finds that the Nevada Supreme Court's denial of the claim asserted by Shelton as Ground 1 of his federal habeas petition was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, and the state courts' ruling was not based on an unreasonable determination of the facts in light of the evidence presented.  *See* 28 U.S.C. § 2254(d).  The court will deny Shelton habeas corpus relief with respect to that claim.

Ground 2

In Ground 2 of his amended habeas petition, Shelton makes another claim that his federal constitutional rights were denied because he received ineffective assistance of trial counsel.

*See* Amended Petition, pp. 7-9.  In Ground 2, Shelton claims that his trial counsel was ineffective for

1   "failure to investigate and adequately prepare a defense." *Id*. at 7.

2        Shelton claims that his trial counsel "was surprised by the introduction of a receipt from

3   Copeland's, a sporting goods store, which supported the alleged victim's version of the events." *Id*.

4   Shelton faults his trial counsel for not learning, before trial, that OC would say that he bought the

5   skateboard tape at the Copeland's Sports store, rather than at Boulevard Mall, and for not being

6   prepared "to challenge the admissibility of the receipt despite the State's reference to Copeland's in

7   its opening statement." *Id*. at 8.  He faults his trial counsel, further, because he "did not ... attempt to

8   interview the alleged victim," "cross-examine the alleged victim as tot he store he supposedly

9   visited," "attempt to impeach the police officers acquisition of the receipt," "or impeach the officers

10  as to why no photographs documented the existence of the grip tape." *Id*.

11       The Nevada Supreme Court ruled on this claim, as follows:

12           ... [A]ppellant claims that trial counsel was ineffective for failing to
             investigate and prepare a defense.  Specifically, he claims that trial counsel should
13           have investigated the sporting goods store near the mall and should have impeached
             or cross-examined the victim and the police officers regarding the receipt from the
14           sporting goods store.  Appellant fails to demonstrate prejudice because he fails to
             demonstrate a reasonable probability of a different outcome at trial had trial counsel
15           done further investigation or impeached the victim and police officers.  As stated
             above, there was overwhelming evidence that appellant was the perpetrator, and
16           appellant fails to allege how further investigation or impeachment would have
             resulted in a different outcome at trial.  Therefore, the district court did not err in
17           denying this claim.

18  Order of Affirmance, Exhibit 113, p. 3.

19       This court agrees that Shelton fails to show prejudice with respect to these claims of

20  ineffective assistance of his trial counsel.  The question whether OC went to Boulevard Mall or to

21  Copeland's Sports to buy skateboard tape was of no importance at Shelton's trial (*see* discussion of

22  evidence at trial, above, at pp. 2-9).  There was evidence indicating that the Copeland's Sports store,

23  while not part of Boulevard Mall, was adjacent to the mall and shared a parking lot with it.

24  *See* Testimony of Detective Raymond Spencer, Exhibit 56B, p. 92; *see also* Transcript of Trial, April

25  13, 2007, Exhibit 57A, p. 14 (stipulation that Copeland's Sports was not located within the

26  Boulevard Mall).  OC told Detective Blasko that he went to Boulevard Mall to buy the skateboard

1  tape, but he testified at trial, more specifically, that he bought the skateboard tape at Copeland's

2  Sports, and the prosecution produced a receipt corroborating that testimony.  *See* Testimony of

3  Detective Janice Blasko, Exhibit 56A, pp. 32-40, 49; Testimony of OC, Exhibit 55B, p. 94, and

4  Exhibit 55C, p. 112.  Shelton's trial counsel made a motion in limine, attempting to exclude from

5  evidence the Copeland's Sports receipt and the testimony of Detective Blasko regarding it, and that

6  motion was denied.  *See* Exhibit 56A, pp. 4-16.  The distinction, however, simply did not matter.

7  Fourteen-year-old OC plainly considered the Copeland's Sports store to be associated with the mall,

8  and considered himself to have gone to the mall to buy the skateboard tape.  Shelton has not shown

9  that OC had any reason to testify untruthfully about where he went to buy the skateboard tape, or, for

10 that matter, where he had been at any time before Shelton drove up and confronted him at the bus

11 stop.  In this court's view, any possible impeachment of OC, or any other witness, that Shelton's trial

12 counsel may have achieved had he better handled this issue would have had no impact on the

13 outcome of the trial.

14      The state courts' denial of the claim asserted by Shelton as Ground 2 of his federal habeas

15 petition was not contrary to, or an unreasonable application of, clearly established federal law, as

16 determined by the Supreme Court of the United States, and the state courts' ruling was not based

17 on an unreasonable determination of the facts in light of the evidence presented.  *See* 28 U.S.C.

18 § 2254(d).  The court will deny Shelton habeas corpus relief with respect to this claim.

19      Ground 3

20      In Ground 3 of his amended habeas petition, Shelton claims that his federal constitutional

21 rights were denied because he received ineffective assistance of appellate counsel.  *See* Amended

22 Petition, pp. 9-11.  There, Shelton claims:

23      Appellate counsel compounded the errors that occurred at trial by failing adequately to brief the issues on appeal.  Although counsel did raise the issue of the Copeland's receipt on appeal, [he] did so in an unpersuasive manner, merely

24 presenting it as a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963). The appellate court rejected this argument.  Appellate counsel failed to make the more

25 compelling argument that the defense is entitled to evidence that would enable effective cross-examination and impeachment.  Specifically the Fifth and Fourteenth

26 Amendments require that the State must provide a criminal defendant with discovery

23

1    that includes all exculpatory evidence in its possession.

2  *Id*. at 9.

3    The Nevada Supreme Court ruled on this claim, as follows:

4        First, appellant claims that appellate counsel was ineffective for failing to
     properly brief issues on appeal.  Specifically, he claims that appellate counsel should
5    have argued that the receipt from the sporting goods store should not have been
     admissible because it was withheld impeachment evidence rather than arguing the
6    evidence was withheld in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).
     Appellant fails to demonstrate that counsel was deficient or that he was prejudiced.
7    Appellate counsel did argue that the receipt was impeachment evidence.  Further,
     appellant fails to demonstrate a reasonable probability of success on appeal had
8    counsel more vigorously argued impeachment rather than *Brady*.  This court
     concluded on appeal that even though trial counsel did not learn of the receipt until
9    trial, he was still fully capable of impeaching the victim's testimony using his prior
     inconsistent statements.  Further, the evidence against appellant was overwhelming.
10   Therefore, the district court did not err in denying this claim.

11       Second, appellant claims that appellate counsel was ineffective for failing to
     cite to authority for the proposition that he was entitled to rely on the State's open-file
12   policy.  This argument relates to the claim above about the sporting goods receipt.
     Appellant fails to demonstrate prejudice because he fails to demonstrate a reasonable
13   probability of success on appeal had appellate counsel cited to authority regarding this
     point.  As state above, the evidence against appellant was overwhelming.  Therefore,
14   the district court did not err in denying this claim.

15  Order of Affirmance, Exhibit 113, p. 6.

16       Here again, this court finds that the question whether OC went to Boulevard Mall or to

17  Copeland's Sports to buy skateboard tape was of no moment at Shelton's trial.  *See* discussion of

18  evidence at trial, above, pp. 2-9; *see also* discussion of Ground 2, above, pp. 21-22.  The Nevada

19  Supreme Court -- the court that would have addressed Shelton's arguments on direct appeal had they

20  been made as Shelton claims they should have been -- held that Shelton failed to show a reasonable

21  probability of success on appeal had appellate counsel made the argument now made by Shelton.

22  This court finds the ruling of the Nevada Supreme Court to be objectively reasonable.

23       The state courts' denial of the claim asserted by Shelton as Ground 3 of his federal habeas

24  petition was not contrary to, or an unreasonable application of, clearly established federal law, as

25  determined by the Supreme Court of the United States, and the state courts' ruling was not based

26  on an unreasonable determination of the facts in light of the evidence presented.  *See* 28 U.S.C.

1    § 2254(d).  The court will deny Shelton habeas corpus relief with respect to this claim.

2        Ground 4

3        In Ground 4 of his amended habeas petition, Shelton claims that his federal constitutional

4    rights were denied because he received ineffective assistance of trial and appellate counsel.  *See*

5    Amended Petition, pp. 11-15.  In Ground 4, Shelton claims that his counsel was ineffective for

6    failure "to properly object to inadmissible bad act evidence," failure "to object to improper

7    prosecutorial misconduct," and failure "to request jury instructions on Mr. Shelton's theory of

8    defense."  *Id*. at 11-13.

9        The False Driver's License

10       Shelton's claim that his trial and appellate counsel were ineffective for failing to properly

11   object to bad act evidence concerns the false California driver's license found in his possession when

12   he was arrested and admitted into evidence at trial.  *See* Amended Petition, p. 12; *see also* Testimony

13   of Robert Montanez, Exhibit 55D, pp. 185-86.  The false driver's license had Shelton's picture on it,

14   but had on it the name "Johnny Wade."  *Id*.  Shelton claims that his trial counsel was ineffective for

15   not requesting a limiting instruction regarding the false driver's license.  Amended Petition, pp. 11-

16   12; Reply, pp. 18-19.  Shelton claims that his appellate counsel "failed to properly object" to the

17   evidence concerning the false driver's license.  *See id*.

18       The Nevada Supreme Court ruled on these claims as follows:

19           ... [A]ppellant claims that trial counsel was ineffective for failing to request a
         limiting instruction regarding prior bad acts.  Specifically, appellant claims that trial

20       counsel should have requested a limiting instruction regarding the false identification
         found in his pocket at the time he was arrested.  Appellant fails to demonstrate

21       prejudice because he fails to demonstrate a reasonable probability of a different
         outcome had trial counsel requested a limiting instruction given the overwhelming

22       evidence. Therefore, the district court did not err in denying this claim.

23                                    *    *    *

24           ... [A]ppellant claims that appellate counsel was ineffective for failing to
         properly object to inadmissible prior bad act evidence.  Appellant admits that

25       appellate counsel did raise this issue on appeal and fails to argue what more appellate
         counsel could have done on appeal with regard to this issue.  Therefore, the district

26       court did not err in denying this claim.

1    Order of Affirmance, Exhibit 113, pp. 3, 7.

2          Before trial, Shelton's trial counsel made a motion in limine to exclude evidence of the false

3    driver's license, and that motion was initially granted.  *See* Exhibit 42 (motion in limine); Exhibit 46,

4    pp. 14-15 (ruling on motion).  However, on the first day of trial, the prosecution asked the court to

5    revisit the issue, arguing that because the false driver's license bore the name "Johnny Wade," and

6    because OC testified that Shelton identified himself as "Johnny," the false driver's license was

7    relevant to the identity of OC's attacker, and corroborated his testimony.  *See* Transcript of Trial,

8    April 10, 2007, Exhibit 52A, pp. 9-10.  The prosecution argued that the false driver's license was

9    also relevant with respect to identity because the height and weight stated on it, which roughly

10   matched Shelton's height and weight, corroborated OC's testimony regarding his attacker.  *See id*.

11   Shelton's counsel argued that the false driver's license should be excluded from evidence.  *See id*. at

12   10-17.  The false driver's license was admitted into evidence, over the objections of Shelton's

13   counsel, during the testimony of Corona, California, Police Officer Robert Montanez.  *See* Exhibit

14   55D, pp. 185-86.

15         Shelton does not provide the court with the text of the jury instruction that he believes his

16   trial counsel should have requested.  *See* Amended Petition, pp. 11-12; Reply, pp. 18-19.

17         At any rate, as the Nevada Supreme Court ruled, even if some jury instruction had been

18   requested, and given, limiting the jury's consideration of the evidence of the false driver's license to

19   the issue of the identity of the individual who assaulted OC, this court sees no reasonable probability

20   that the result of Shelton's trial would have been different.  The prior bad act -- Shelton's possession

21   of a false driver's license -- paled in comparison to the crimes Shelton was accused of committing in

22   this case, and there was overwhelming evidence, beyond the false driver's license, that Shelton

23   committed those crimes.  *See* discussion of evidence at trial, above, at pp. 2-9.

24

25         On Shelton's direct appeal, Shelton's counsel raised the issue of the evidence of the false

26   driver's license, arguing that its admission was error.  Appellant's Opening Brief, Exhibit 74, pp. 11-

1  14; Appellant's Reply Brief, Exhibit 79, pp. 4-6.  The Nevada Supreme Court rejected that argument,

2  ruling as follows:

> Shelton alleges that the district court improperly admitted a false driver's license found in his pocket at the time of his arrest because it was hearsay and unduly prejudicial.  We disagree.
>
> Shelton's false identification was found in his pocket bearing his picture, but was in the name of Johnny Wade and indicated a height of 5'11 and a weight of 211 pounds.  Notably, O.C. told police that his perpetrator introduced himself as "Johnny" and was approximately 6 feet tall and weighed approximately 200 pounds.  Because the identification was found on Shelton's person, the district court concluded that the evidence was admissible to show Shelton's identity and to corroborate O.C.'s testimony.
>
> Here, Shelton fails to offer a persuasive argument why the false identification found in his pocket at the time of his arrest was inadmissible hearsay.  Furthermore, although Shelton argues that the jury would prejudicially infer that Shelton committed other crimes because he carried a false identification, we disagree that admitting the identification was prejudicial as the jury could not have rationally concluded that because Shelton carried a false identification, he must have sexually assaulted O.C.  Accordingly, we conclude that the district court did not improperly admit evidence of Shelton's false identification.

14  Order of Affirmance, Exhibit 82, pp. 2-3.  Shelton's claim that his appellate counsel "failed to

15  properly object" to the evidence concerning the false driver's license is unexplained and

16  unsupported, and is belied by the record.  Shelton does not show that his appellate counsel could

17  have done anything else regarding the issue of the evidence of the false driver's license to change the

18  outcome of the appeal.

19     The state courts' denial of the claims asserted by Shelton in Ground 4, regarding counsel's

20  handling of the issue of the evidence of the false driver's license, was not contrary to, or an

21  unreasonable application of, clearly established federal law, as determined by the Supreme Court of

22  the United States, and the state courts' ruling was not based on an unreasonable determination of the

23  facts in light of the evidence presented.  *See* 28 U.S.C. § 2254(d).  The court will deny Shelton

24  habeas corpus relief with respect to those claims.

25        <u>Alleged Prosecutorial Misconduct and Alleged Improper Comment by the Judge</u>

26     Next, in Ground 4, Shelton claims that his trial and appellate counsel were ineffective for

27

1    failing to object to alleged prosecutorial misconduct.  Amended Petition, pp. 12-13.  Shelton argues

2    that his counsel should have objected to the following alleged misconduct of the prosecutor:

3           -       "a reference to Mr. Shelton's supposed use of his police badge to deceive the
                    alleged victim;"

4
5           -       "a reference to Mr. Shelton supposedly forcing the alleged victim to swallow
                    his ejaculate;" and

6           -       "other instances where either the State or one of its witnesses improperly
                    vouched for a witness or for a piece of evidence."

7

8    *See* Amended Petition, pp. 12-13.  Shelton also claims that his appellate counsel was ineffective for

9    failing to make, on appeal, an argument regarding a comment made by the trial judge in overruling

10   an objection to certain testimony of OC's mother.  *See id*. at 13.

11          The first allegation of prosecutorial misconduct concerns the following comment by the

12   prosecutor in her opening statement:

13          We, as parents -- we, as a society, try to teach our children, to protect our children.
            Don't talk to strangers.  If you get lost, honey, look for a policeman.  The badge is
14          meant to protect and to serve.  But not for [OC].  On May 21, 2006 last year, 14-year-
            old [OC], the badge was used to prey upon the child, not to protect him.

15

16   Transcript of Trial, April 11, 2007, Exhibit 55A, p. 49.  The Nevada Supreme Court ruled, as

17   follows, on Shelton's claim that his trial counsel was ineffective for failing to object:

18              Appellant claims that this was an improper statement because it was an
            attempt to inflame or excite the passions of the jury.  However, these statements were
19          the facts of the case.  Appellant approached the victim and told him that he was a
            police officer and that he was investigating a crime.  The State was merely using the
20          evidence that was to be presented to the jury to explain why the victim would have
            left with appellant in the first place.  *Garner v. State*, 78 Nev. 366, 371, 374 P.2d 525,
21          528 (1962) ("It is proper for the prosecutor to outline his theory of the case and
            propose those facts he intends to prove.").  Further, to the extent that the language
22          used may have tended to inflame the passions of the jury, appellant fails to
            demonstrate a reasonable probability of a different outcome at trial had trial counsel
23          objected given the overwhelming evidence against appellant.

24

25   Order of Affirmance, Exhibit 113, p. 4.  And, regarding Shelton's appellate counsel, the Nevada

26   Supreme Court ruled that these "were proper statements of the facts in this case and appellant failed

                                              28

1    to demonstrate there was a reasonable probability of success on appeal had appellate counsel raised

2    these claims because there was overwhelming evidence of guilt." *Id*. at 7.

3          The second instance of alleged prosecutorial misconduct concerns the following comment of

4    the prosecutor in her opening statement:

5          ... [O]ne of the things that happened at the time of the attack, adding insult to injury,
            was that he was forced to swallow the ejaculate.

6

7    Transcript of Trial, April 11, 2007, Exhibit 55A, p. 55.  The trial transcript indicates that when the

8    prosecutor made this comment an unidentified speaker exclaimed:  "Oh my God."  *Id*.  The Nevada

9    Supreme Court ruled, as follows, on Shelton's claim that his trial counsel was ineffective for failing

10   to object:

11         The victim testified at trial that appellant forced him to swallow the ejaculate,
            therefore, the State was outlining the facts it intended to prove.  *See* [*Garner v. State*,
12          78 Nev. 366, 371, 374 P.2d 525, 528 (1962)].  Further, appellant fails to demonstrate
            a reasonable probability of a different outcome at trial had trial counsel objected given
13          the overwhelming evidence against appellant.  Therefore, the district court did not err
            in denying these claims.
14

15   Order of Affirmance, Exhibit 113, pp. 4-5.  Regarding Shelton's appellate counsel, the Nevada

16   Supreme Court ruled that these "were proper statements of the facts in this case and appellant failed

17   to demonstrate there was a reasonable probability of success on appeal had appellate counsel raised

18   these claims because there was overwhelming evidence of guilt."  *Id*. at 7.

19         This court finds that, with respect to both of these comments of the prosecutor in her opening

20   statement, the Nevada Supreme Court's rulings were reasonable.  The facts stated by the prosecutor -

21   - that Shelton used a badge to prey upon OC, and that Shelton forced OC to swallow his ejaculate --

22   were subsequently proven at trial beyond any dispute.  To the extent that the comments included

23   argument that might have been inflammatory, or otherwise inappropriate in an opening statement,

24   there is no reasonable probability that an objection by Shelton's trial counsel, or argument on appeal

25   by Shelton's appellate counsel, could have changed the outcome.  Shelton was not prejudiced.

26         Shelton also claims that his trial and appellate counsel were ineffective in that they did not

29

object to "other instances where either the State or one of its witnesses improperly vouched for a witness or for a piece of evidence." Amended Petition, p. 13. This claim is completely meritless, because Shelton does not specify where in the record, or how, the prosecutor, or any prosecution witness, "improperly vouched for a witness or for a piece of evidence." *See* Amended Petition, pp. 12-13; Reply, pp. 19-21.

Next, Shelton claims that his appellate counsel was ineffective for not making an argument regarding comments made by the trial judge, before the jury, when overruling defense counsel's objection to certain testimony of OC's mother. Amended Petition, p. 13. The exchange that is the subject of this claim was the following:

> Q.      How is [OC] doing?
>
> MR. COLUCCI [defense counsel]:  I'm going to object.  I don't think that's relevant.
>
> THE COURT:  Sustained.
>
> BY MS. HOLTHUS [prosecutor]:
>
> Q.      Did you notice any changes in [OC] from before May 21st to after May 21st?
>
> MR. COLUCCI:  Objection.  Irrelevant.
>
> MS. HOLTHUS:  Absolutely relevant.
>
> THE COURT:  I think it goes to his credibility and his truthfulness and whether the incident actually occurred, so I'm going to allow it.
>
> *     *     *
>
> A.      Before May the 21st, his -- well, he was a peaceful child.  He skateboards a lot.  After May 21st, he doesn't skate as much.  He's always sad.  He's always scared.  He tries to be strong so I don't realize he's sad, but I do notice it.

Transcript of Trial, April 11, 2007, Exhibit 55C, pp. 125-26. With regard to Shelton's claim that his appellate counsel was ineffective for failure to raise this as an issue on his direct appeal, the Nevada Supreme Court ruled as follows:

1

> Appellant failed to demonstrate that appellate counsel was deficient because the district court's statement explained why it was overruling the objection and did not comment directly on the testimony.  Further, appellant failed to demonstrate a reasonable probability of success on appeal had appellate counsel raised this issue given the overwhelming nature of the evidence against appellant.  Therefore, the district court did not err in denying this claim.

2

3

4

5   Order of Affirmance, Exhibit 113, p. 8.  This court finds the Nevada Supreme Court's ruling with

6   respect to this claim to be objectively reasonable.  Shelton does not point to any Nevada precedent

7   supporting an argument on appeal regarding the trial judge's comment.  And also, importantly, the

8   Nevada Supreme Court, which ruled that Shelton failed to demonstrate a reasonable probability of

9   success on appeal had appellate counsel raised the issue, is the court that would have ruled on the

10  issue on his direct appeal had it been raised.

11         The state courts' denial of the claims asserted by Shelton in Ground 4, regarding his

12  counsel's handling of the alleged prosecutorial misconduct, and the alleged improper comments of

13  the trial judge, was not contrary to, or an unreasonable application of, clearly established federal law,

14  as determined by the Supreme Court of the United States, and the state courts' ruling was not

15  based on an unreasonable determination of the facts in light of the evidence presented.  *See* 28

16  U.S.C. § 2254(d).  The court will deny Shelton habeas corpus relief with respect to those claims.

17                    Jury Instructions Regarding Shelton's Theory of Defense

18         Next, in Ground 4, Shelton claims that his trial counsel was ineffective for failing to request

19  "a jury instruction on the lesser included crime of statutory seduction," and "an instruction on the

20  issue of consent."  *See* Amended Petition, pp. 13-15.  Shelton argues:

21

> Considering the evidence presented that the alleged victim['s] testimony was inconsistent in his accounts of the events as well as Mr. Shelton's counsel's concession that Mr. Shelton was with the alleged victim, the lesser included offense of statutory seduction should have been presented to the jury as a lesser included offense to Sexual Assault.  Compounded with this failure was trial counsel's error in not even requesting that the jury be instructed on consent.  As such the jury had no roadmap to determine whether or not a sexual encounter between Shelton and the alleged victim affected the sexual assault charge.

22

23

24

25

26  *Id*. at 13-14.

31

1    The Nevada Supreme Court rejected this claim, ruling as follows:

2        ... [A]ppellant claims that trial counsel was ineffective for failing to request
      jury instructions on appellant's theory of defense, namely, statutory sexual seduction
3      and consent.  Appellant fails to demonstrate that trial counsel was deficient or that he
      was prejudiced.  There was no evidence presented at trial that would support a theory
4      of statutory sexual seduction or consent; therefore, appellant would not have been
      entitled to instructions on those issues.  *Rosas v. State*, 122 Nev. 1258, 1269, 147
5      P.3d 1101, 1109 (2006).  Further, appellant fails to demonstrate a reasonable
      probability of a different outcome at trial had trial counsel requested the instructions
6      given the overwhelming evidence presented at trial.  Therefore, the district court did
      not err in denying this claim.

7

8    Order of Affirmance, Exhibit 113, p. 5.

9        The ruling of the Nevada Supreme Court was objectively reasonable.  There was no evidence

10   presented at trial to support a theory that the sexual contact between Shelton and OC was consensual.

11   *See* discussion of evidence at trial, above, at pp. 2-9.  Shelton asserts that OC's testimony was

12   inconsistent with respect to his account of the events, but in making this argument Shelton does not

13   specify any inconsistency at all in OC's testimony, much less any inconsistency that would justify

14   the giving of jury instructions regarding statutory seduction or consent.  *See* Amended Petition, pp.

15   13-14; Reply, p. 21.  If Shelton refers to OC's testimony regarding whether he went to Boulevard

16   Mall or Copeland's Sports to buy skateboard tape, this court finds that alleged inconsistency to be of

17   no significance, as is discussed above (pp. 21-24).  In short, there was no evidentiary support

18   whatsoever for jury instructions on statutory seduction or consent, Shelton's trial counsel did not act

19   unreasonably in failing to request such instructions, and Shelton was not prejudiced by the lack of

20   such instructions.

21       The state courts' denial of the claim asserted by Shelton in Ground 4 was not contrary to, or

22   an unreasonable application of, clearly established federal law, as determined by the Supreme Court

23   of the United States, and the state courts' ruling was not based on an unreasonable determination of

24   the facts in light of the evidence presented.  *See* 28 U.S.C. § 2254(d).

25       Conclusion Regarding Merits of Claims

26       Shelton does not show habeas relief to be warranted.  The court has considered all his claims

32

1  of ineffective assistance of counsel, both individually and cumulatively, and determines that there is

2  no reasonable probability that the outcome of his trial or appeal would have been different had

3  counsel performed as he argues counsel should have.  The state courts' denial of Shelton's claims

4  was objectively reasonable.  This court will deny the amended petition for writ of habeas corpus.

5  <u>Certificate of Appealability</u>

6  　　　　The standard for issuance of a certificate of appealability requires for a "substantial showing

7  of the denial of a constitutional right."  28 U.S.C. § 2253(c).  The Supreme Court interpreted

8  28 U.S.C. §2253(c) as follows:

9  　　　Where a district court has rejected the constitutional claims on the merits, the
10 　　　showing required to satisfy § 2253(c) is straightforward:  The petitioner must
　　　　demonstrate that reasonable jurists would find the district court's assessment of the
　　　　constitutional claims debatable or wrong.
11
12 *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79

13 (9th Cir. 2000).  The Supreme Court further illuminated the standard in *Miller-El v. Cockrell*,

14 537 U.S. 322 (2003).  The Court stated in that case:

15 　　　We do not require petitioner to prove, before the issuance of a COA, that some jurists
　　　　would grant the petition for habeas corpus.  Indeed, a claim can be debatable even
16 　　　though every jurist of reason might agree, after the COA has been granted and the
　　　　case has received full consideration, that petitioner will not prevail.  As we stated in
17 　　　*Slack*, "[w]here a district court has rejected the constitutional claims on the merits, the
　　　　showing required to satisfy § 2253(c) is straightforward: The petitioner must
18 　　　demonstrate that reasonable jurists would find the district court's assessment of the
　　　　constitutional claims debatable or wrong."

19 *Miller-El*, 123 S.Ct. at 1040 (quoting *Slack*, 529 U.S. at 484).

20 　　　　The court has considered Shelton's claims, with respect to whether they satisfy the standard

21 for issuance of a certificate of appeal, and the court determines that none of them do.  The court will

22 deny Shelton a certificate of appealability.

23 　　　　**IT IS THEREFORE ORDERED** that the petitioner's Amended Petition for Writ of Habeas

24 Corpus (ECF No. 6) is **DENIED**.

25 　　　　**IT IS FURTHER ORDERED** that petitioner is denied a certificate of appealability.

26

33

1          **IT IS FURTHER ORDERED** that the clerk of the court shall **ENTER JUDGMENT**

2   **ACCORDINGLY.**

3

4          Dated March 19, 2015.

5

6                                              _____

7                                              UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26